```
                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                           TAMPA DIVISION

HEALTH & SUN RESEARCH, INC.
d/b/a Kava Kava Intl. and
Vegas Tan,

        Plaintiff,
v.                                  Case No. 8:12-cv-2319-T-33MAP

AUSTRALIAN GOLD, LLC,

        Defendant,
_____/

AUSTRALIAN GOLD, LLC,

        Counter-Plaintiff,
v.

HEALTH & SUN RESEARCH, INC.
d/b/a Kava Kava Intl. and
Vegas Tan,

        Counter-Defendant.
_____/
```

## ORDER

This matter comes before the Court pursuant to Australian Gold, LLC's Sealed Motion for Summary Judgment (Doc. # 43) filed on August 16, 2013. Health & Sun Research, Inc. filed a Sealed Response in Opposition to the Motion for Summary Judgment (Doc. # 48) on September 16, 2013, to which Australian Gold filed a Sealed Reply (Doc. # 53) on September 27, 2013. For the reasons that follow, the Court denies the

Motion for Summary Judgment.[1]

## I. Background

Health and Sun develops and sells indoor tanning lotions for use in tanning beds. Health and Sun is comprised of different brands, such as Kava Kava International and Vegas Tan, among others. (Carollo Dep. Doc. # 48-1 at 17:5-22). According to its President, Santo Carollo, Health and Sun offers approximately 300 different products. (Id. at 34:4-5). Carollo testified that Health and Sun sells its tanning lotions to thousands of tanning salons in the United States and Canada via direct sales to salons and as well as through distributors. (Id. at 35:4-8; 76:2-7).

Health and Sun's indoor tanning lotions at issue are known as Royal Flush and Purple Rain. Health and Sun does not have a formal trademark registration for Royal Flush or Purple Rain. Rather, it relies on use for the basis of its common law trademark rights in Royal Flush and Purple Rain. (Id. at

---

[1] Although the parties' submissions before the Court were filed under seal, the Court declines to file the present Order under seal. "The operations of the courts and the judicial conduct of judges are matters of utmost public concern and the common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." Romero v. Drummond Co., 480 F.3d 1234, 1245 (11th Cir. 2007)(internal citations omitted).

2

63:3-10). Carollo testified that Health and Sun has sold a tanning lotion under the trademark Purple Rain since 2001. (Id. at 22:9-10). Carollo also testified that Health and Sun has sold a tanning lotion under the trademark Royal Flush since 2005. (Id.).

According to Carollo, Health and Sun's "products have a years-long shelf life prior to the time the bottles of lotion are opened." (Carollo Decl. Doc. # 48-3 at ¶ 4). During his deposition, Carollo indicated that he had a bottle "made in 1996 . . . that's still good" and that, once opened, the product remained viable for up to 2 years. (Carollo Dep. Doc. # 48-2 at 33:7-23). Carollo explains that Health and Sun's distributors "will therefore purchase a large quantity of product in a single transaction, which they can sell to tanning salons over a period of months or even years. As a result, a sporadic pattern of sales is not atypical for [Health and Sun]." (Carollo Decl. Doc. # 48-3 at ¶ 4).

Australian Gold also sells indoor tanning lotions, including two products known as Royal Flush and Purple Reign. Specifically, Australian Gold owns Reg. No. 4,081,252, filed on January 27, 2011, and registered on January 3, 2012, for the trademark Royal Flush®. (Doc. # 43-2). Australian Gold began selling Royal Flush in August of 2011. Australian Gold

3

also owns Reg. No. 4,085,143 filed on March 2, 2011, and registered on January 10, 2012, for the trademark Purple Reign®. (Id.). Australian Gold began selling Purple Reign in August of 2011.

Health and Sun contacted Australian Gold after Australian Gold began selling these products in 2011. (Golay Dep. Doc. # 48-2 at 81:11-25). Health and Sun asserted that Australian Gold's products infringed Health and Sun's trademarks. (Id.). On October 11, 2012, Health and Sun filed a three count Complaint against Australian Gold asserting violation of the Lanham Act, 15 U.S.C. § 1125(a), common law trademark infringement under Florida Law, and common law unfair competition. (Doc. # 1). Australian Gold filed an Answer to the Complaint and asserted the affirmative defenses of abandonment, laches, and trademark misuse. (Doc. # 27). In addition, Australian Gold lodged counterclaims against Health and Sun for trademark infringement and abuse of process/trademark misuse. (Id.).

At this juncture, Australian Gold seeks summary judgment as to Health and Sun's Lanham Act and state law claims and also seeks a finding that Health and Sun has infringed Australian Gold's marks. The basis for Australian Gold's arguments is that Health and Sun has abandoned its Royal Flush

4

and Purple Rain marks.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged

its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981), cert. denied, 456 U.S. 1010 (1982).

6

### III. Trademark Abandonment

#### A. Legal Standard

"To bring a trademark infringement claim under the Lanham Act, a plaintiff must hold a valid trademark." Natural Answers, Inc. v. SmithKline Beecham, 529 F.3d 1325, 1329 (11th Cir. 2008). Under the Lanham Act, a trademark is deemed abandoned, and thus no longer valid, "when its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127; see also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc., 304 F.3d 1167, 1173 (11th Cir. 2002)("a defendant who successfully shows that a trademark plaintiff has abandoned a mark is free to use the mark without liability to the plaintiff."); Tally-Ho, Inc. v. Coast Cmty. Coll. Dist., 889 F.2d 1018, 1022-23 (11th Cir. 1989)("Trademark ownership is always appurtenant to commercial activity. Thus, actual and continuous use is required to acquire and retain a protectible interest in a mark.").

As stated in Cumulus Media, Inc., "Abandonment is trademark law's way of recognizing that trademark rights flow from use." 304 F.3d at 1173. That is, "if a trademark holder ceases using a mark with an intent not to resume its use, the mark is deemed abandoned and falls into the public domain and

7

is free for all to use. Abandonment paves the way for future possession and property in any other person." Natural Answers, Inc., 529 F.3d at 1329.

In this case, Australian Gold seeks a finding that Health and Sun has abandoned its trademarks and therefore, must establish two elements: "(1) that [Health and Sun] ceased using the mark[s] in dispute and (2) that [Health and Sun] has done so with an intent not to resume [their] use." Cumulus Media, Inc., 304 F.3d at 1174. For the purpose of determining when abandonment has occurred, the Lanham Act defines "use" as "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. The Lanham Act directs that "intent not to resume [use] may be inferred from the circumstances." Id. As discussed in Natural Answers, Inc., the intent to resume use of a trademark "cannot be far-flung or indefinite; rather, there must be an intent to resume use within the reasonably foreseeable future." 529 F.3d at 1329. Under the Lanham Act, "Nonuse for 3 consecutive years shall be prima facie evidence of abandonment, 15 U.S.C. § 1127, which creates a rebuttable presumption of intent not to resume use." Id. at 1329-1330.

Ultimately, Australian Gold faces a strict burden on its abandonment theory. "Because a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting abandonment face a stringent, heavy, or strict burden of proof." Cumulus Media, Inc., 304 F.3d at 1175. "[B]oth non-use and intent not to resume must be strictly proved." Id.

### B. Sales Information

Although evidence of sales made is not dispositive of trademark abandonment issues, Health and Sun's sales of its Royal Flush and Purple Rain products are highly relevant to the dual inquiries of whether Health and Sun made bona fide use of its marks and whether Health and Sun intended to forever relinquish its rights to its marks.

The record shows that Health and Sun, through distributors or otherwise, has disseminated thousands of bottles of its Royal Flush product in commerce as follows:

```
2005:     7,389
2006:     4,619
2007:     4,314
2008:     1,413
2009:     0
2010:     0
2011:     801
2012:     666
2013:     0
```

9

(Doc. # 43-3).

Health and Sun has likewise sold thousands of bottles of its Purple Rain product. The record demonstrates that Health and Sun made the following sales of Purple Rain:

```
2003:     1,300
2004:     2,121
2005:     409
2006:     409
2007:     0
2008:     0
2009:     1,468
2010:     540
2011:     1,970
2012:     0
```

(Doc. # 43-7).[2]

### C. Abandonment Analysis

#### 1. Royal Flush

Health and Sun does not dispute that it did not make any sales of its Royal Flush product for more than three years before Australian Gold's use began in August of 2011. Health and Sun specifically acknowledges that it experienced a three year lapse in sales from July of 2008, to September of 2011.

---

[2] In summarizing Health and Sun's sales of its Royal Flush and Purple Rain products, the Court has relied upon raw data from Health and Sun's spreadsheets as well as upon the testimony of Carollo.

(Doc. # 48 at 11).[3]  As such, Australian Gold enjoys the rebuttable presumption that Health and Sun does not intend to resume use of the Royal Flush mark.  Thus, "the burden of production, although not the ultimate burden of persuasion, shifts to [Health and Sun]" to show intent to resume use as to the Royal Flush mark.  <u>Natural Answers, Inc.</u>, 529 F.3d at 1330; <u>E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.</u>, 756 F.2d 1525, 1532 (11th Cir. 1985).

At this juncture, the issue before the Court is whether Health and Sun "intended to resume meaningful commercial use of the mark [Royal Flush]." <u>AmBrit, Inc. v. Kraft, Inc.</u>, 812 F.2d 1531, 1550 (11th Cir. 1986).  Such an intent "may be inferred from the circumstances," <u>Cumulus Media, Inc.</u>, 304 F.3d at 1174, but in the Eleventh Circuit, "such an intent cannot be far-flung or indefinite." <u>Natural Answers, Inc.</u>, 529 F.3d at 1329.

Here, Health and Sun has come forward with evidence to create a genuine issue of material fact for trial regarding

---

[3] The three year gap in sales occurred between July of 2008, and August of 2011. (Doc. # 43-3).  The 1,413 sales of Royal Flush in 2008 occurred prior to July, and the 801 sales of Royal Flush in 2011 occurred after August. (<u>Id.</u>).

11

whether it intended to resume use of the Royal Flush mark. Health and Sun's President has filed a declaration indicating:

> [Health and Sun] has always intended to continue producing and offering its Royal Flush and Purple Rain tanning lotions to distributors and indoor tanning salons. Because the lotions were not new to the market, [Health and Sun] recognized that the sales of these lotions would be sporadic as tanning salons and distributors sought to replenish dwindling inventories of the lotions over time. Regardless, [Health and Sun] continued to see an interest in these lotions and view these lotions as two long-term staples of its product offering.

(Carollo Decl. Doc. # 48-3 at ¶ 6).

Australian Gold compares Carollo's declaration to the unavailing declaration filed in <u>Natural Answers, Inc.</u> There, the Eleventh Circuit upheld a finding of abandonment when the plaintiff Natural Answers tendered only the affidavit of its CEO to bolster its intent to utilize marks that it had not used in over three years:

> Natural Answers has provided no evidence of actual and concrete plans to resume use in the reasonably foreseeable future. All it presented to the district court was the bare assertion by its CEO that it intended to resume use if it could find ample funding and the unsupported assertion that Philip Morris had requested more information from Natural Answers after it sent Philip Morris a letter soliciting a joint venture in 2003. Such putative negotiations amount to nothing more than an unsolicited proposal by Natural Answers that led nowhere. Quite simply, that is not enough. Indeed, if all a party had to do to avoid a finding of abandonment was to aver that it never intended

12

> to abandon the trademark, then no trademark would ever be abandoned, no matter how long its use had been withdrawn from the market, or how inchoate and speculative any intention to resume its use.

<u>Natural Answers, Inc.</u>, at 1330.

In <u>Natural Answers, Inc.</u>, the plaintiff developed and manufactured a non-nicotine herbal lozenge, "HerbaQuit," to aid in smoking cessation. <u>Id.</u> at 1327. The plaintiff filed a federal trademark application for HerbaQuit on two occasions, but both were rejected. <u>Id.</u>  The HerbaQuit product was on the market from January of 2000, to March of 2002. <u>Id.</u> During that time, the plaintiff sold approximately 50,000 packages of HerbaQuit. <u>Id.</u>  "On November 6, 2002, more than seven months after the sale of HerbaQuit Lozenges was discontinued, [defendant] launched the Commit Lozenges product," an FDA approved smoking cessation nicotine product. <u>Id.</u> The record showed that the defendant began developing the Commit Lozenges in 1998, applied for FDA approval in 2000, and received FDA approval for clinical testing in 2002. <u>Id.</u>  The defendant received a federal trademark for COMMIT in 2003. <u>Id.</u> When the plaintiff brought a trademark action against the defendant, defendant utilized the defense of abandonment. <u>Id.</u>  In response, the plaintiff's CEO tendered an affidavit indicating that plaintiff never intended to abandon its common law trademark. Under the facts of that case, the CEO's affidavit

13

was not sufficient to withstand the defendant's motion for summary judgment.

The facts of the present can be distinguished from those presented in the <u>Natural Answers, Inc.</u> case. There, the plaintiff stopped selling its product in 2002 and never reentered the market. It further admitted that it had neither the funds nor ability to reenter the market. In the present case, Health and Sun resumed the sale of its Royal Flush product after the three year lapse and has continued to do so during the time in which Australian Gold has offered a competing product under the same name. The Court recognizes that "the bare assertion by [a company's] CEO that it intended to resume use" is unavailing. However, in this case, Carollo's declaration is supported by circumstances showing Health and Sun's intent to use the Royal Flush mark. The long shelf-life of the product combined with the fact that tanning salons purchased many bottles of the Royal Flush product at one time demonstrate how Health and Sun could sustain a three year period of sales inactivity while still maintaining a market presence and use of the Royal Flush mark.

Australian Gold also argues that Health and Sun has shown that it lacks the intent to use the Royal Flush mark by making only "token sales" of the Royal Flush product. The Court

14

determines that a triable issue of fact exists concerning whether Health and Sun's sales were "token sales" as Australian Gold contends, or rather, whether such sales were bona fide, as maintained by Health and Sun.

As stated in Person's Co., Ltd. v. Christman, 900 F.2d 1565, 1571 (Fed. Cir. 1990), a case in which summary judgment on the abandonment defense was denied where the sales of the marked goods were intermittent, "[t]here is . . . no rule of law that the owner of a trademark must reach a particular level of success, measured by the size of the market or by its own level of sales, to avoid abandoning a mark." Rather, as stated in Cumulus Media, Inc., "'Use' as contemplated by the definition of abandonment in 15 U.S.C. § 1127 . . . means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 304 F.3d at 1174, n.7. In addition, there must be enough use of the mark to create goodwill in the trademark; the mark must be sufficiently promoted to identify the registrant as the product's source in the mind of the public. See Blue Bell, Inc. v. Farah Mfg. Co., Inc., 508 F.2d 1260, 1266 (5th Cir. 1975).

Australian Gold characterizes Health and Sun's sales of both Royal Flush and Purple Rain as "de minimis" and compares

15

Health and Sun's sales to the "sporadic, casual, and nominal" sales made by Jean Patou, Inc. in <u>La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.</u>, 495 F.2d 1265, 1274 (2d Cir. 1974). There, the plaintiff LeGalion, a French perfume manufacturer, sold its perfume under the trademark SNOB in foreign countries, with substantial sales in excess of $2 million. <u>Id.</u> at 1268. LeGalion was unable to sell its perfume in the United States because, in 1951, Patou, an American perfume maker, obtained a trademark registration for SNOB. <u>Id.</u> In spite of the registration, Patou sold only 89 bottles of perfume between 1950 and 1971. <u>Id.</u> at 1269. When Patou's trademark was challenged by LeGalion, the court found abandonment and noted that "the twenty-year period of inaction by defendant persuades us that any use it made of the SNOB mark was purely defensive, and insufficient to obtain enforceable rights in the mark." <u>Id.</u> at 1274. Here, the lapse in sales was for three years, as compared to twenty, and Health and Sun sold thousands of bottles of lotion, as compared with 89 bottles of perfume. Australian Gold has demonstrated a lapse in sales and has also offered some evidence indicating that Health and Sun has not actively marketed its Royal Flush products. However, the Court cannot

16

say, as a matter of law, that Health and Sun abandoned its mark.

In addition to Health and Sun's sales of the Royal Flush product and the declaration of its President affirming that Health and Sun intends to continue to use the marks (and likewise never intended to stop using its challenged marks), Health and Sun has engaged in business as well as litigation conduct that evinces its intent to protect and use its marks. When Health and Sun learned that Australian Gold was producing competing products under the names Royal Flush and Purple Reign, it demanded that Australian Gold cease and desist. Thereafter, Health and Sun filed the instant trademark action in an effort to safeguard its marks.

"It is difficult for a defendant to prove a plaintiff's subjective intent to abandon a mark." Int'l Stamp Art, Inc. v. USPS, No. 1:02-cv-2459, 2005 U.S. Dist. LEXIS 42073, at *21 (M.D. Ga. May 27, 2005). In this case, the evidence Health and Sun has presented is sufficient to establish a genuine dispute of material fact as to whether it abandoned the Royal Flush mark. The determination of whether Health and Sun intended to relinquish its rights cannot be made at the summary judgment stage in light of conflicting evidence on

17

file. The Motion for Summary Judgment is accordingly denied as to Royal Flush.

### 2. Purple Rain

Australian Gold likewise contends that Health and Sun abandoned its Purple Rain mark. As previously noted, to prevail on this defense, Australian Gold must demonstrate that Health and Sun (1) ceased using the Purple Rain mark (2) with an intent not to resume use of the mark.

Australian Gold does not enjoy a presumption of abandonment with respect to Purple Rain because, unlike the Royal Flush product, at no time was there a three year lapse in sales of the Purple Rain product. The record shows that Health and Sun has sold thousands of bottles of its Purple Rain product, and Australian Gold has not demonstrated that Health and Sun has stopped using its Purple Rain mark for a period of time sufficient to show abandonment at the summary judgment stage. In fact, the record shows that Health and Sun recently ordered 1,500 bottles of Purple Rain lotion from its supplier on June 7, 2013. (Doc. # 43-11 at 1). The conflicting evidence presented by the parties creates a genuine issue of material fact regarding the issue of whether Health and Sun has made bona fide use of its mark.

18

Even if Australian Gold could show that Health and Sun ceased using its Purple Rain mark, it has not shown that any such cessation in use by Health and Sun was done with the intent not to resume use of the mark as a matter of law. The Court adopts its above analysis of Health and Sun's intent as to the Royal Flush mark and finds its analysis applicable to Health and Sun's intent to use the Purple Rain mark. The Motion for Summary Judgment is also denied as to Purple Rain.

To summarize, Health and Sun has continuously used the mark in commerce and has sold thousands of bottles of Purple Rain. Australian Gold has not shown, as a matter of law, that Health and Sun's Purple Rain sales are mere "token sales" made only to retain its mark. Rather Health and Sun has come forward with evidence sufficient to create a genuine issue of fact concerning whether such sales were a bona fide use of its Purple Rain mark. Furthermore, Health and Sun has expressed its intention not to relinquish its mark in a declaration made by its President, and has diligently prosecuted this action against Australian Gold in an effort to safeguard its right to utilize its Purple Rain mark. The Court accordingly denies Australian Gold's Motion for Summary Judgment.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED**:

Australian Gold, LLC's Sealed Motion for Summary Judgment (Doc. # 43) is **DENIED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>14th</u> day of November, 2013.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:   All Counsel of Record