**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**HEALTH & SUN RESEARCH, INC.**
**D/B/A KAVA KAVA INTL. AND**
**VEGAS TAN,**

**Plaintiff,**

**v.** **CASE NO.: 8:12-cv-02319-VMC-MAP**

**AUSTRALIAN GOLD, LLC**

**Defendant,**
__________________________________/

**AUSTRALIAN GOLD, LLC,**

**Counter-Plaintiff,**

**v.**

**HEALTH & SUN RESEARCH, INC.**
**D/B/A KAVA KAVA INTL. AND**
**VEGAS TAN,**

**Counter-Defendant.**
__________________________________/

# JOINT PRETRIAL STATEMENT

The parties, by and through their undersigned counsel, hereby file their Joint Pre-Trial Statement and state as follows:

## I. BASIS FOR FEDERAL JURISDICTION

**By Plaintiff & Defendant:**

This is an action alleging false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a); and alleging trademark infringement and unfair competition under the common law of Florida. This Court has jurisdiction over the subject of this action pursuant to Section 39 of

the Lanham Act, 15 U.S.C. §1121; pursuant to Chapter 85 of the Judiciary and Judicial Procedure Code, 28 U.S.C. §§ 1331 and 1338; pursuant to diversity of citizenship, 28 U.S.C. §1332; and has supplemental jurisdiction over claims under state law under 28 U.S.C. §1367(a).

## II. NATURE OF THE ACTION

Health & Sun Research, Inc. d/b/a Kava Kava Intl. and Vegas Tan ("HSR") brings this cause of action for false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and for trademark infringement and unfair competition under the common law of Florida arising out of Defendant, Australian Gold, LLC ("Australian Gold")'s sale of two indoor tanning lotion products. Australian Gold has countersued for trademark infringement as to ROYAL FLUSH and trademark misuse as to both ROYAL FLUSH and PURPLE RAIN.

## III. GENERAL STATEMENT OF EACH PARTY'S CASE

**By Plaintiff:**

HSR, through its various fictitious names (including Kava Kava International and Vegas Tan) is in the business of manufacturing, distributing and selling various skin care products for use in connection with indoor tanning salons. The two tanning lotions at issue in this matter are PURPLE RAIN and ROYAL FLUSH (collectively referred to as the "HSR Marks"). HSR has been selling lotions under the trademarks PURPLE RAIN and ROYAL FLUSH since as early as October 2001 and April 2005, respectively, and has continuously thereafter offered them for sale and/or distribution to its distributors and tanning salons.

Australian Gold is also in the business of manufacturing and selling lotions for use in indoor tanning businesses and has admitted to selling lotions using the identical term ROYAL FLUSH and the identically-sounding term PURPLE REIGN since at least August 1, 2011 and at least September 2011, respectively – well after HSR's adoption and first use of the HSR Marks. With full knowledge

of HSR's rights and the willful and deliberate intent to trade on HSR's goodwill, Australian Gold began infringing on HSR's rights by using the HSR Marks without permission, license or authority. In fact, HSR notified Australian Gold of its rights in the subject marks *prior to* Australian Gold's first use of the marks and Australian Gold did nothing to cease its plans to sell the infringing products.

In its Amended Answer, Australian Gold asserted the affirmative defenses of Abandonment, Laches/Acquiescence, and Trademark Misuse. In sum, Australian Gold claims that following HSR's alleged abandonment of the HSR Marks, it registered and now owns trademarks for ROYAL FLUSH® and PURPLE REIGN® (U.S. Trademark Registration Nos. 4,081,252 and 4,085,143). As such, Australian Gold claims HSR is knowingly asserting claims to trademark rights which do not exist and for the improper purpose of harassment and interference with its business operations. Australian Gold has counterclaimed for alleged trademark infringement as to the ROYAL FLUSH product which is premised on a finding that HSR abandoned the ROYAL FLUSH mark.

Substantively, Australian Gold cannot be afforded any relief because its affirmative defenses and related counterclaims are not only meritless, but as explained *infra*, are also based on mutually inconsistent premises (*i.e.*, abandonment, which requires a lack of intent to continue use, while simultaneously alleging infringement based on continued sales, which inherently requires intent). Australian Gold's entire defense and its affirmative causes of action rest entirely on the premise that HSR has abandoned its rights to the Marks. In support, it advances a dubious argument that a lack of sales for a period three years constitutes *per se* abandonment. First, a three year period of cessation is only *prima facie* evidence of abandonment; it is not dispositive. More pertinently, this position overlooks the critical fact that abandonment requires proof that a putative infringer has ***both***: 1)

ceased using the mark in dispute; and 2) done so with an ***intent*** not to resume its use. In the instant matter, HSR has done neither.

As to PURPLE RAIN, it is undisputed that HSR had sales in both 2009 and 2010, the two years immediately preceding Australian Gold's infringement. For that reason alone, HSR cannot be said to have forfeited its rights in PURPLE RAIN. Moreover, HSR's PURPLE RAIN product has been available for purchase by tanning salons and consumers from various distributors on a nearly continuous basis, thus preventing a finding of abandonment. Australian Gold argues the sales from 2009 through 2011 are *de minimus* and cannot defeat this supposed presumption of abandonment. This is incorrect; the law requires complete cessation to establish abandonment. Nominal commercial sales of a trademarked good are sufficient where there is a legitimate explanation for the paucity, as is the case here. In fact, nominal sales, and gaps in sales, to tanning salons and distributors are commonplace in the industry and do not signal the cessation of the manufacture or sale of a certain product. This is because the indoor tanning industry is seasonal and, therefore, sales often fluctuate.

In view of these numerous variables, including HSR's customary practices, the product's life cycle, and the nature of the business, it does not follow that nominal sales alone or a gap in sales automatically establishes an intent to discontinue use of a trademarked product. Fittingly, HSR's intent to continue use of its mark is best demonstrated by its continued sales of the product in 2011. In sum, because HSR did not forfeit any of its rights in PURPLE RAIN, Australian Gold's claims of abandonment and trademark misuse/abuse of process must fail.

As to ROYAL FLUSH, Australian Gold relies exclusively on the fact HSR cannot produce evidence of sales to distributors or tanning salons, or promotional materials for the three year period preceding its infringement. However, lack of sales, if one can even be said to exist in this instance,

is not dispositive. Evidence of advertisements are equally immaterial. Rather, it is HSR's demonstrated intent to continue the manufacture and sale of ROYAL FLUSH, discussed *supra,* that defeats Australian Gold's abandonment claim. Yet again, this intent can be demonstrated by HSR's continued sales of ROYAL FLUSH through September of 2011.

Additionally, it is undisputed that HSR engages in minimal advertising and, when it does, usually by brand as opposed to a particular lotion. However, HSR's distributors have their own catalogs in which they market the products they carry, including HSR's lotions. The absence of HSR's own advertisements does not demonstrate the lotions were not being promoted within the marketplace. Likewise, a lack of sales flowing directly from HSR to distributors or salons does not establish that the distributors or salons themselves were not selling the product directly to consumers. Once HSR sells its products to a distributor, it does not formally track the distributor's sales. However, a single instance of "use" made in good faith defeats a claim of abandonment and pursuant to the Lanham Act, "use" of a trademark includes "placement on goods sold or transported in commerce…" It does not require a specific amount of sales directly from the trademark holder to the ultimate end-consumer.

Because HSR did not forfeit its rights in the ROYAL FLUSH mark, Australian Gold cannot claim any trademark right in ROYAL FLUSH® under Registration No. 4,081,252 against HSR, as it is well-established the rights of a holder of a federally registered trademark are subject to the rights of an unregistered mark which was used first in the particular geographic market. Likewise, Australian Gold cannot claim HSR has engaged in any trademark infringement or misuse, or abuse of process, as it is HSR, not Australian Gold, that has established legal rights in the HSR Marks.

Australian Gold's assertions that HSR's claims are somehow equitably barred by laches or acquiescence are likewise baseless. At the time Australian Gold was contacted by HSR's counsel in

August 2011, Australian Gold was already making unauthorized use of the HSR Marks and continues to do so today. Even by their own admission, Australian Gold had already filed for U.S. Trademark Registrations of the marks in January and March 2011, approximately six months prior to being contacted by HSR. This is demonstrative of Australian Gold's intention to use the protected Marks regardless of and well before it was contacted by counsel for HSR. In sum, Australian Gold did not change its position based on the actions or inactions of HSR; rather, it simply continued on its previous and purposeful decision to illegally infringe on HSR's trademark rights. Moreover, the fact that HSR's counsel provided Australian Gold with a cease-and-desist demand fourteen months prior to filing suit does not in any way demonstrate that HSR acquiesced to Australian Gold's infringements or a forfeiture of its trademark rights. To the contrary, a pre-suit cease-and-desist demand and ensuing litigation is evidence of HSR's desire to continue use of its protected trademarks and its desire to enforce its rights regarding the same.

**By Defendant:**

As a brief summary, the questions in this case are about the existence of trademark rights: (1) do HSR's claimed rights currently exist or are they abandoned?; and (2) if not abandoned (or only abandoned in part), where do HSR's rights exist? HSR must prove it owns rights in the trademarks PURPLE RAIN and ROYAL FLUSH and where those rights exist. The evidence will show that HSR abandoned whatever rights it may have once had.

HSR had abandoned the ROYAL FLUSH mark as of August 2011, when Australian Gold's ROYAL FLUSH sales began. HSR admits that it made no sales or other use of the mark for a period of three consecutive years before Australian Gold started using ROYAL FLUSH. This is *prima facie* evidence that HSR abandoned the ROYAL FLUSH mark under 15 U.S.C. §1127. HSR has alleged a speculative intent to keep selling products as long as someone is

willing to buy them. This uncorroborated hindsight statement is, at best, a declaration of an intent not to abandon, rather than the corroborated intent to resume that is required to prevent abandonment. A resumption of sales or litigation after a period of non-use does not prove that intent existed during the period of non-use. HSR's resumption of sales of ROYAL FLUSH beginning in September 2011 therefore infringes Australian Gold's rights in ROYAL FLUSH®.

Sporadic and occasional sales are not bona fide use sufficient to prevent abandonment. Actual and continuous use is required to retain rights, not *de minimis* or token use. Regarding PURPLE RAIN, HSR had two sales from October 2006 to Australian Gold's adoption of its PURPLE REIGN® mark in August 2011. Alternatively, there has been one sale in the past three years. Health & Sun's single PURPLE RAIN sale of less than $4,000 in the past three years (and three sales totaling less than $8,000 over six years) to a single customer are *de minimis* and insufficient to maintain whatever rights it once had in PURPLE RAIN. HSR also has no advertising, no catalogs, inactive websites, cancelled business name registrations, and no evidence of further distribution or sales, all of which proves HSR's nonuse without intent to resume. HSR's post-hoc intent claim is also unsupported and insufficient with respect to PURPLE RAIN.

Even if HSR's marks were not wholly abandoned as of August 1, 2011, HSR's rights are limited to the areas where HSR actually used the mark and a zone of natural expansion. For example, the only evidence of HSR's PURPLE RAIN sales are to a single customer in Westlake, Ohio. Thus, HSR only has rights in those areas or, alternatively, has abandoned any rights it may have once had in other markets.

Even assuming HSR has rights in the marks, there is no likelihood of confusion between the respective products. As they appear in the marketplace, Australian Gold's products differ from HSR's in numerous ways: bottle shape, bottle size, label color scheme, font, and artwork all

differ substantially between the respective pairs of products and create distinct commercial impressions. HSR's PURPLE RAIN and ROYAL FLUSH products are also marketed as part of its brands KAVA KAVA and VEGAS TAN brands, respectively. Australian Gold's products are offered as part of a distinguishable group of LOVE DS-labeled products. While the parties could use similar advertising media outlets, HSR has not actually advertised its PURPLE RAIN and ROYAL FLUSH products in many years and does not know whether those products appear in any catalogs. Regarding the other likelihood of confusion factors, Australian Gold did not intend to confuse consumers in adopting its marks and HSR has admitted it has no evidence of actual confusion.

Laches and/or acquiescence also bar HSR from recovery. Soon after Australian Gold's introduction of its PURPLE REIGN and ROYAL FLUSH products, on August 5, 2011, HSR contacted Australian Gold and claimed trademark rights in PURPLE RAIN and ROYAL FLUSH. HSR's message did not demand that Australian Gold cease-and-desist its usage of PURPLE REIGN and ROYAL FLUSH. Rather, the message explicitly stated "this letter is not intended to be a threat" and sought to discuss "potential" infringement. Australian Gold replied the same day that HSR's two products appeared to be discontinued and requested evidence of current use. HSR's one-sentence reply was "The products are still available." On August 12, 2011, counsel for Australian Gold sent a follow-up letter to HSR asserting that HSR's claimed trademark rights appeared to be abandoned and requested "specific, factual evidence where and how the ROYAL FLUSH and PURPLE RAIN products are still available?" HSR did not respond to the August 12, 2011 request for evidence. Australian Gold never received any evidence that HSR's two products were currently available. Australian Gold received no further communication from HSR regarding this matter until the present complaint was filed fourteen

months later. This unreasonable silence for fourteen months constitutes acquiescence. Australian Gold was prejudiced by HSR's silence by continuing to invest in and sell its PURPLE REIGN and ROYAL FLUSH products.

## IV. LIST OF EXHIBITS

**Plaintiff:**

See attached form.

**Defendant:**

See attached form.

## V. LIST OF WITNESSES

**Plaintiff:**

1. Santo J. Carollo (Corporate Representative of HSR)
2. Lewis Henry
3. Sharon Edwards
4. Angela Provo
5. Emily Golay (Corporate Representative of Australian Gold)
6. Martin Sperry (Corporate Representative of Australian Gold)
7. All of Defendant's witnesses
8. Any rebuttal witnesses

**Defendant:**

1. Santo J. Carollo (Corporate Representative of HSR)
2. Angela Provo
3. Emily Golay

4. Martin Sperry

## VI. LIST OF EXPERT WITNESSES

**Plaintiff:**

1. Gary L. Raines, CPA

**Defendant**:

1. Michael Mard—Mr. Mard will testify regarding the alleged damages. Mr. Mard will testify regarding methods of calculating damages in trademark cases; specifically Mr. Mard will testify regarding Australian Gold's sales and profits for the PURPLE REIGN® and ROYAL FLUSH® products and HSR's claims to Australian Gold's profits and/or HSR's claim of actual damages sustained by HSR, such as lost profits. If Mr. Raines testifies, Mr. Mard is also expected to rebut Mr. Raines' damages analysis.

## VII. MONEY DAMAGES CLAIMED

**Plaintiff:**

**A. Compensatory:**

Pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a)(1), HSR is entitled to Australian Gold's profits which were derived as a result of their infringement on HSR's Marks. As of January 2013, HSR is owed the following amounts of profits earned by Australian Gold:

- PURPLE REIGN®: **$2,317,930.00**
- ROYAL FLUSH®: **$1,534,649.00**

*See* Rebuttal Report of Gary L. Rains, CPA, dated June 18, 2013. As Australian Gold continues to derive profits from its infringement on HSR's Marks, HSR continues to incur additional damages.

HSR reserves the right to supplement its damages claims to allow for a final accounting of all profits derived from the unauthorized use of the Marks following a judgment in its favor.

With respect to damages, HSR is only required to establish Australian Gold's gross sales of the infringing products. It is Australian Gold's burden to establish and proper deductions for costs from those sales figures. In proving other deductions aside from product costs, Australian Gold may only seek to deduct costs that are actually related to the sales of the infringing product. Australian Gold may not seek deduction of a proportion of "fixed" costs, such as overhead, if the sales of the infringing products constitute only a small percentage of its total sales. In other words, Australian Gold can only seek to deduct overhead and related corporate expenses if it proves that it would not have incurred those expenses without selling the infringing products.

HSR is also entitled to recover the value of its lost sales attributable to Australian Gold's infringement. 15 U.S.C. §1117(a)(2).

HSR is further entitled to recover the costs incurred in bringing this action. 15 U.S.C. §1117(a)(3). HSR further contends that given, *inter alia*, the willful conduct of Australian Gold in offering its infringing products despite being notified of HSR's rights, this Court should treble the award of actual damages against Australian Gold. 15 U.S.C. §1117(a)(3).

**B. Exceptional Damages:**

This matter is an "exceptional case" within the meaning of Section 35(a) of the Lanham Act due to Australian Gold's unauthorized use of the HSR Marks with full knowledge of HSR's rights, and in bad faith with willful and deliberate intent to trade on HSR's goodwill. Therefore, HSR is entitled to recovery of its reasonable attorney fees pursuant to 15 U.S.C. § 1117(a)(3).

**C. Response to Australian Gold's Compensatory and Exceptional Damages Claims**

HSR denies that Australian Gold is entitled to any compensatory or exceptional damages arising from its counterclaim of trademark infringement with respect to its ROYAL FLUSH mark as HSR will establish it has superior rights to the ROYAL FLUSH trademark by virtue of its earlier use.

**Defendant:**

**A. Response to HSR's Compensatory Claim:**

Australian Gold denies HSR is entitled to any damages, and denies HSR's methodology and calculations reflected in the figures stated above. A prevailing infringement plaintiff is entitled, subject to principles of equity, to "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). "Such sum in either of the above circumstances shall constitute compensation and not a penalty." *Id.* Further, damages and profits cannot be awarded simultaneously if it would result in overcompensation. 5 McCarthy on Trademarks and Unfair Competition §30:73 (Sept. 2013).

If the plaintiff is claiming a defendant's profits as damages, the plaintiff presents a prima facie case by presenting the defendant's sales: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a).

Profits are defined as sales minus costs. HSR's damages claim presented above is (combined) more than four times the amounts that HSR agrees is Australian Gold's total gross sales. Thus, HSR cannot credibly be claiming Australian Gold's profits. Alternately, to claim its actual damages, the plaintiff is "required to establish that [defendant's] alleged Lanham Act violations proximately caused it to suffer monetary damages." *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1252 (11th Cir. 2007). "Lost profits are calculated by estimating the revenue lost due to the

infringing conduct and subtracting what it would have cost to generate that revenue." *Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co.*, 630 F. Supp. 2d 255, 262 (E.D.N.Y. 2008). HSR has admitted it knows of no lost sales, and has not produced any evidence of causation. HSR's damages analysis does not account for any costs. Australian Gold also denies that an award of Plaintiff's costs, treble damages, or any enhancement of damages, would be appropriate in this case.

**B. Australian Gold's Compensatory Claim**

Regarding Australian Gold's counterclaim for infringement of its ROYAL FLUSH® trademark registration, pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a)(1), Australian Gold is entitled to HSR's profits which were derived as a result of its infringement of ROYAL FLUSH®. Australian Gold must only prove HSR's sales; HSR must prove all elements of cost or deduction claimed. § 1117(a). HSR's sales for the period September 2011 to June 2013 were **$11,735**. (HSR Dep. Ex. 34.) Defendant understands that HSR has continued to sell infringing ROYAL FLUSH products, incurring additional damages in an amount to be proven. Australian Gold is also entitled to costs pursuant to § 1117(a)(3).

**C. Exceptional Damages:**

Australian Gold denies that HSR is entitled to attorney fees or any other form of punitive damages. Australian Gold seeks a declaration that this is an "exceptional case" in view of HSR's assertion of trademark rights that do not exist and an award of its reasonable attorney fees pursuant to § 1117(a).

## VIII. DEPOSITIONS TO BE OFFERED INTO EVIDENCE

The Parties anticipate that the use of deposition transcripts will be limited to instances where the listed witnesses are unavailable to be present at trial or for impeachment. Although the Parties

do not at this time believe that any deposed witness will be unavailable, such witnesses are included on the list below in the abundance of caution.

**Plaintiff:**

1. Depositions listed by Defendant in their entirety, and all exhibits marked therein.
2. Santo Carollo, and all exhibits marked therein.
3. Gary L. Raines, and all exhibits marked therein.
4. Martin Sperry, and all exhibits marked therein.
5. Michael Mard, and all exhibits marked therein.
6. Emily Golay, and all exhibits marked therein.

**Defendant:**

1. Excerpts from Santo Carollo / Health & Sun Research, Inc., to be determined.
2. Excerpts from Gary L. Raines, to be determined.

## IX. CONCISE STATEMENT OF FACTS WHICH ARE ADMITTED AND WILL REQUIRE NO PROOF AT TRIAL.

1. The trademark PURPLE RAIN is neither generic nor descriptive as applied to indoor suntan lotions.

2. The trademark ROYAL FLUSH is neither generic nor descriptive as applied to indoor suntan lotions.

3. O.L. Products, a company affiliated with HSR, has manufactured tanning lotions for HSR, including PURPLE RAIN and ROYAL FLUSH.

4. HSR sells many of_its lotions via direct sales from HSR to tanning salons and via distributors, as is common in the indoor tanning lotion industry.

5. The indoor tanning industry is seasonal, so sales fluctuate throughout the year.

6. HSR's distributors have their own catalogs in which they market the products they carry, including many of HSR's lotions.

7. Like most indoor tanning lotions, HSR's lotions do not have a defined lifespan, but once a lotion bottle is opened, the expiration date is typically 18-24 months after opening.

8. Australian Gold owns U.S. Trademark Reg. No. 4,081,252, filed January 27, 2011, for the trademark ROYAL FLUSH®.

9. Australian Gold owns U.S. Trademark Reg. No. 4,085,143, filed March 2, 2011, for the trademark PURPLE REIGN®.

10. Australian Gold's mark PURPLE REIGN® is the phonetic equivalent of HSR's mark PURPLE RAIN.

11. Australian Gold's ROYAL FLUSH® mark is identical to HSR's ROYAL FLUSH mark.

12. Australian Gold uses its ROYAL FLUSH ® and PURPLE REIGN® marks on indoor tanning lotions.

13. Australian Gold began selling its ROYAL FLUSH® and PURPLE REIGN® products in August 2011.

14. HSR has no contractual or license-type relationship with Australian Gold and therefore does not have the right to exercise quality control over Australian Gold.

15. Between September 2011 and October 31, 2013, Australian Gold sold $741,791 worth of PURPLE REIGN® branded products in the United States.

16. Between September 2011 and October 31, 2013, Australian Gold sold $279,540 worth of ROYAL FLUSH® branded products in the United States.

17. Australian Gold had gross sales of approximately $75 million in 2012 across all of its product lines.

18. HSR made the following sales of ROYAL FLUSH since 2003:

2005: 7,389
2006: 4,619
2007: 4,314
2008: 1,413
2009: 0
2010: 0
2011: 801
2012: 666
2013: to be produced by HSR

19. HSR sold zero ROYAL FLUSH products from at least July 2008 through August 2011.

20. After a period of no sales for more than three years, HSR resumed sales of ROYAL FLUSH in September 2011.

21. HSR's September 2011 sales were after Australian Gold began selling its ROYAL FLUSH products.

22. HSR has no records dated after 2006 of advertising or any other promotional efforts related to its alleged ROYAL FLUSH products.

23. HSR cannot identify any promotional material for the ROYAL FLUSH product created after 2006.

24. Within the last three or four years HSR has not printed or distributed any catalogs in which the ROYAL FLUSH product appeared.

25. HSR has no documents regarding plans, investments, intent, or efforts to resume or increase sales of ROYAL FLUSH from 2006 to the present.

26. Health & Sun filed this case under, the dba VEGAS TAN in connection with its alleged rights to ROYAL FLUSH.

27. From September 2011 to June 2013, HSR sold $11,137 worth of ROYAL FLUSH lotion. This total to be updated after production by HSR.

28. HSR made the following sales of PURPLE RAIN since 2003:

2003: 1,300
2004: 2,121
2005: 409
2006: 409
2007: 0
2008: 0
2009: 1,468
2010: 540
2011: 1,970
2012: 0
2013: 0

29. On or about March 11, 2009, HSR sold 1,468 bottles of PURPLE RAIN to Ultraviolet Resources International in Westlake, Ohio for $2,921.32.

30. On or about January 27, 2010, HSR sold 540 bottles of PURPLE RAIN to Ultraviolet Resources International in Westlake, Ohio for $1,074.60.

31. On or about August 31, 2011, an invoice from Devoted Creations, Inc. to Ultraviolet Resources International in Westlake, Ohio records a sale of 1,970 bottles of PURPLE RAIN for $3,940.00.

32. HSR has not sold any PURPLE RAIN products to a distributor since August 31, 2011.

33. HSR has no manufacturing records related to its PURPLE RAIN product between 2005 and 2013.

34. HSR does not have any current inventory of its PURPLE RAIN product.

35. HSR has no records of advertising or other promotional efforts related to its PURPLE RAIN product dated after 2006.

36. On August 5, 2011, counsel for HSR contacted Australian Gold and claimed trademark rights in the trademarks PURPLE RAIN and ROYAL FLUSH.

37. On August 5, 2011, counsel for Australian Gold replied and requested HSR supply evidence of current use of the PURPLE RAIN and ROYAL FLUSH marks.

38. HSR sent a one-sentence reply email on August 5, 2011 stating "The products are still available." No evidence was included with that email.

39. On August 12, 2011, counsel for Australian Gold sent HSR's counsel a letter requesting "specific, factual evidence where and how the ROYAL FLUSH and PURPLE RAIN products are still available?"

40. HSR did not respond to the August 12, 2011 request for evidence. Australian Gold received no communication from HSR regarding this matter after August 5, 2011, until the present Complaint was filed in October 2012.

41. Australian Gold did not cease sales of its PURPLE REIGN or ROYAL FLUSH products after receiving HSR's claim to trademark rights in those names in August 2011.

## X. CONCISE STATEMENT OF APPLICABLE PRINCIPLES OF LAW IN WHICH THERE IS AGREEMENT.

### *ELEMENTS OF TRADEMARK AND UNFAIR COMPETITION CLAIMS*

Plaintiff's cause of action for false designation of origin is governed by Section 43(a) of the Lanham Act, 15 U.S. C. § 1125(a) and federal court precedent thereunder. Plaintiff's causes of action

for trademark infringement and unfair competition are governed by Florida state law as interpreted by the state of Florida, federal court precedent and common law precedent.

Section 43(a) of the Lanham Act provides for liability for Unfair Competition resulting from a False Designation of Origin where a plaintiff has established:

> (a) any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (i) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (ii) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

To establish a prima facie case of trademark infringement under § 43(a), a plaintiff [HSR] must show "(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks*, Inc., 106 F.3d 355, 358 (11th Cir.1997)

A cause of action for injunctive relief under common-law unfair competition based on trade name or trademark infringement requires that four main elements be alleged and proved:

> (1) plaintiff first adopted and used a certain name, mark, symbol, logo, or design in a certain market or trade area as a means of establishing goodwill and reputation, and to describe, identify, or denominate particular services rendered or offered or goods made or sold by plaintiff, to distinguish them from similar services or goods rendered, offered, or marketed by others;
>
> (2) through its association with such services or goods, plaintiff's trade name, mark, or other such entity has acquired a special significance as the name of services rendered or goods marketed by the plaintiff in its trade area. Such special significance may arise in one of two ways: (a) plaintiff's trade name, mark, or other such entity is

> inherently distinctive, meaning fanciful, novel or arbitrary, or (b) plaintiff's trade name, mark, or other such entity, though generic, descriptive, or geographic, has by actual usage acquired in a certain trade area a secondary, special, or trade meaning as indicating, describing, identifying, or denominating the plaintiff as the source of certain services or goods;
>
> (3) defendant has begun or intends to begin using an identical or confusingly similar trade name, mark, or other such entity to indicate or identify similar services rendered, or similar goods marketed by defendant in competition with plaintiff in the same trade area in which plaintiff has already established its trade name, mark, or other such entity; and
>
> (4) as a consequence of defendant's action, or threatened action, customer confusion as to the source or sponsorship of the services or goods offered, or to be offered, by defendant is probable or inevitable.

*Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018 (11th Cir. 1989) (applying Florida law); *American Bank of Merritt Island v. First American Bank and Trust*, 455 So. 2d 443 (Fla. Dist. Ct. App. 5th Dist. 1984).

The elements of unfair competition under Florida common law are: (1) deceptive or fraudulent conduct of a competitor, and (2) a likelihood of consumer confusion. *Whitney Information Network, Inc. v. Gagnon*, 353 F. Supp. 2d 1208 (M.D. Fla. 2005); *Alphamed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.*, 391 F. Supp. 2d 1148 (S.D. Fla. 2005).

Defendant's cause of action for trademark infringement is governed by Section 32(1) of the Lanham Act, 15 U.S.C. §1114(1) and federal court precedent thereunder. The Lanham Act provides, in relevant part:

> (1) Any person who shall, without the consent of the registrant —
>
> > (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ...
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a) (2006). "To prevail on a claim of trademark infringement in this case, [Australian Gold] must establish: (1) that they possess a valid mark, (2) that [HSR] used the mark, (3) that [HSR's] use of the mark occurred 'in commerce,' (4) that [HSR] used the mark 'in connection with the sale ... or advertising of any goods,' and (5) that [HSR] used the mark in a manner likely to confuse consumers." *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1218 (11th Cir. 2008). A certificate of registration is "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate." 15 U.S.C. § 1057(b).

### *RIGHTS REQUIRE BONA FIDE USE*

Trademark rights do not exist without bona fide use in commerce. 15 U.S.C. § 1127. The Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary course of trade." *Id.* Bona fide use must be "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Planetary Motion, Inc. v. Techplosion, Inc.*, 261 F.3d 1188, 1195 (11th Cir. 2001) (quoting *New England Duplicating Co. v. Mendes*, 190 F.2d 415 (1st Cir. 1951)). Whether use is sufficient to establish trademark rights is dependent on the totality of the circumstances, and "the existence of sales or lack thereof does not by itself determine whether a user of a mark has established ownership rights therein." *Planetary Motion*, 261 F.3d at 1196.

### *TERRITORIAL NATURE OF TRADEMARK RIGHTS*

Rights to use of a mark are geographically limited to "the territory throughout which it is known and from which it has drawn its trade." *Tana v. Dantanna's*, 661 F. 3d 767, 780 (11th Cir.

2010). "The territorial extent of trademark protection is limited to those geographic areas in which a mark is actually used in commerce and a zone of reasonable future expansion." *Tally-Ho, Inc. v. Coast Community Coll. Dist.*, 889 F.2d 1018, 1027-28 (11th Cir. 1989).

Common law (unregistered) trademark rights are "appropriated only through actual prior use in commerce." *Tally-Ho, Inc. v. Coast Community Coll. Dist.*, 889 F.2d 1018, 1022 (11th Cir. 1989). "The owner of a registered mark, in contrast, enjoys the unlimited right to use the mark nationwide, and federal registration affords the registrant priority over all future users of confusingly similar marks. 15 U.S.C. § 1057(c) . . . . Therefore, a Lanham Act plaintiff asserting common-law trademark rights under § 43(a) against the owner of a registered mark, as here, bears the burden of establishing the right to use its mark by actual use in a given territory." *Tana v. Dantanna's*, 611 F.3d 767, 780-81 (11th Cir. 2010). "And because registration constitutes constructive nationwide notice of the registrant's priority of use of a mark, 15 U.S.C. § 1072, only actual use occurring prior to such registration gives rise to enforceable common-law trademark rights, 15 U.S.C. § 1065. Thus, federal registration has the practical effect of freezing a prior user's enforceable trademark rights thereby terminating any right to future expansion beyond the user's existing territory." *Id.*

The rights of a holder of a federally registered mark are subject to the rights of a holder of an unregistered mark if the unregistered mark was used first in the particular geographic market. *Tally-Ho*, 889 F. 2d at 1023.

## *MULTI-FACTOR TEST FOR LIKELIHOOD OF CONFUSION*

"In determining whether a likelihood of confusion exists, the fact finder evaluates a number of elements including [the following seven factors]: the strength of the [mark], the similarity of [the mark], the similarity of the product, the similarity of retail outlets and purchasers, the similarity of

advertising media used, the defendant's intent, and actual confusion. The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists." Rather, a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision. The appropriate weight to be given to each of these factors varies with the circumstances of the case. *Dippin' Dots, Inc. v. Frosty Bites Dist.*, 369 F.3d 1197, 1207 (11th Cir. 2004) (quoting *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1538 (11th Cir. 1986)); *see also Jellibeans, Inc. v. Skating Clubs of Ga.*, 716 F.2d 833, 840 (11th Cir. 1983). In the Eleventh Circuit, the two most important factors to consider are the type (strength) of the mark and evidence of actual confusion. Suntree Technologies, Inc. v. Ecosense Intern., Inc., 693 F.3d 1338, 1346 (11th Cir. 2012) *citing Dieter v. B & H Indus. of Sw. Florida, Inc.*, 880 F.2d 322, 326 (11th Cir. 1989).

## *TRADEMARK ABANDONMENT*

"Abandonment is trademark law's way of recognizing that '[t]rademark rights flow from use.'" *Cumulus Media, Inc. v. Clear Channel Commnc'ns, Inc.*, 304 F.3d 1167, 1173 (11th Cir. 2002) (quoting *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1550 (11th Cir. 1986)). If a mark is abandoned, it "falls into the public domain and is free for all to use." *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F. 3d 1167, 1174 (11th Cir. 2002). Abandonment is a question of fact. *Id.* Under the Lanham Act, a protectable mark is considered abandoned if "its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. A defendant must first establish a prima facie case of abandonment. *Cumulus*, 304 F.3d at 1176. Nonuse for three years is prima facie evidence of abandonment. 15 U.S.C. § 1127. After a prima facie showing of abandonment, the burden shifts to the plaintiff to produce evidence that it either used the mark during the statutory

period or intended to resume use. *Cumulus*, 304 F.3d at 1177. The ultimate burden of persuasion on the issue of abandonment remains with the defendant. *Id.*

"'Use' as contemplated by the definition of abandonment in 15 U.S.C. § 1127 requires more than mere token use: 'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." *Cumulus Media, Inc. v. Clear Channel Commnc'ns, Inc.*, 304 F.3d 1167, 1174 n.7 (11th Cir. 2001) (internal quotation marks omitted). "[T]he existence of sales or lack thereof does not by itself determine whether a user of a mark has established ownership rights therein." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F. 3d 1188, 1196 (11th Cir. 2001). There is no rule of law that the owner of a trademark must reach a particular level of success, measured by the size of the market or by its own level of sales, to avoid abandoning a mark." *Pearson's Co., Ltd. v. Christman*, 900 F. 2d 1565, 1571 (Fed. Cir. 1990).

To avoid abandonment, a trademark owner must show "actual and concrete plans" to resume meaningful commercial use of the mark in the reasonably foreseeable future. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1550 (11th Cir. 1986); *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1329-30 (11th Cir. 2008). Uncorroborated assertions and noncommittal, indefinite, conclusory, vague, or nebulous testimony do not demonstrate intent to resume use. *Natural Answers*, 529 F.3d at 1330; *Gen Healthcare Ltd. v. Qashat*, 364 F.3d 332, 337-38 (1st Cir. 2004); *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 294 (5th Cir. 2004). Intent to resume use must be formulated during the period of non-use. *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 149 n.9 (2d Cir. 2007); *Imperial Tobacco, Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1580-81 (Fed. Cir. 1990); *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 537 (4th Cir. 2000).

A trademark can be partially abandoned in some geographic areas. *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 123-24 (5th Cir. 1973) ("[A] user may abandon a trademark

in certain states without abandoning it in others . . . ."); *HH Scott, Inc. v. Annapolis Electroacoustic Corp.*, 195 F. Supp. 208, 216-17 (D. Md. 1961) ("[T]he limited local retail use of the name and the marks . . . constituted an 'abandonment' of the marks in the national market."); *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 765-766 (6th Cir. 2005).

## *LACHES AND ACQUIESCENCE*

"The equitable defense of estoppel by laches may be applied to bar claims for trade dress or trademark infringement brought under the Lanham Act. . . . Though the doctrine is an equitable doctrine that should be applied flexibly, a defendant must demonstrate the presence of three elements in order to successfully assert laches as a defense: (1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Kason Indus., Inc. v. Component Hardware Grp.*, 120 F.3d 1199, 1203 (11th Cir. 1997).

"The defense of acquiescence requires proof of three elements: (1) the plaintiff actively represented it would not assert a right or claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008) (citation and quotation omitted). "'Active consent' does not necessarily mean an explicit promise not to sue. It only requires 'conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant.'" *Univ. of Ala. Bd. of Trustees v. New Life Art*, 683 F.3d 1266, 1281-82 (11th Cir. 2012) (quoting and citing *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 547-48 (10th Cir.2000) and *Coach House Rest., Inc. v. Coach & Six Rests.*, Inc., 934 F.2d 1551, 1558, 1564 (11th Cir.1991)).

## ***DAMAGES***

Under the Lanham Act, damages for trademark infringement may include (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the cost of the action. *Aronowitz v. Health-Chem Corp.,* 513 F.3d 1229, 1241 (11th Cir. 2008). In determining profits, a plaintiff only is required to prove the defendant's gross sales.. The defendant also may prove its costs or other deductions which it claims should be subtracted from the amount of its sales to determine its profits on such sales. *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 586 (5th Cir. 1980). In proving other deductions aside from product costs, a defendant may only seek to deduct costs that are actually related to the sales of the infringing product. *Id.* In other words, a defendant can only seek to deduct overhead and related corporate expenses if it proves that it would not have incurred those expenses without selling the infringing products. *Abbott Labs. v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1242 (11th Cir. 2000)

## ***EQUITABLE RELIEF***

"Under traditional equitable principles, a plaintiff seeking a permanent injunction must demonstrate (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *Angel Flight of Ga. v. Angel Flight Am.*, 522 F.3d 1200, 1208 (11th Cir. 2008) (citing *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)). This analysis applies to trademark and unfair competition claims. *Angel Flight*, 522 F.3d at 1208.

## XI. CONCISE STATEMENT OF THOSE ISSUES OF FACT WHICH REMAIN TO BE LITIGATED.

1. Whether HSR engages in minimal advertising, but does so through trade magazines and usually by brand as opposed to a particular lotion.

2. Whether through its distributors, HSR's products are sold to thousands of tanning salons across the country.

3. Whether HSR continues producing and selling a lotion as long as a distributor or tanning salon is willing to order and purchase the product.

4. Whether since at least as early as 2001, HSR has sold an indoor tanning lotion under the trademark PURPLE RAIN.

5. Whether PURPLE RAIN is a product within HSR's Kava Kava International brand.

6. Whether PURPLE RAIN is sold to tanning salons by distributors who purchase the product from HSR.

7. Whether and where PURPLE RAIN products have been or are available for purchase by the public.

8. Whether HSR sold its PURPLE RAIN products in 2009 and 2010 at substantial losses, with profit margins of -162% and -192% respectively.

9. Whether since 2005, HSR has sold an indoor tanning lotion under the trademark ROYAL FLUSH.

10. Whether ROYAL FLUSH is a product within HSR's Vegas Tan brand.

11. Whether Health & Sun's Florida fictitious name registration on VEGAS TAN expired in 2010.

12. Whether Health & Sun's website for VEGAS TAN, www.vtlotion.com, is operational.

13. Whether HSR sells ROYAL FLUSH to tanning salons via distributors who purchase the product from HSR, as well as through direct sales from HSR to tanning salons.

14. Whether and where PURPLE RAIN products have been or are available for purchase by the public.

15. Where and how Australian Gold sells its ROYAL FLUSH® and PURPLE REIGN® products.

16. Whether HSR began using its ROYAL FLUSH and PURPLE RAIN marks prior to Australian Gold's use of ROYAL FLUSH® and PURPLE REIGN®.

17. Whether as to PURPLE RAIN, HSR has had a three year period of nonuse since it began using the PURPLE RAIN mark on indoor tanning lotion products.

18. Whether HSR's fictitious name registrations on "Kava Kava International" and "Kava Kava Intl." are expired.

42. Whether Health & Sun's websites for KAVA KAVA, www.kavatan.com and www.kavakavaintl.com, are operational.

19. Whether HSR replenished its diminishing inventory of ROYAL FLUSH in 2011.

20. Whether HSR's principal and corporate representative, Santo Carollo, has stated it was always HSR's intent to continue offering ROYAL FLUSH and PURPLE RAIN to distributors willing to market and sell it.

21. Whether on August 5, 2011, counsel for HSR issued a pre-suit cease-and-desist demand to Australian Gold regarding the PURPLE RAIN and ROYAL FLUSH trademarks.

22. Whether HSR was required to provide additional evidence to Australian Gold following up to the August 5, 2011 letter.

23. Whether Australian Gold continued to sell its ROYAL FLUSH® and PURPLE REIGN ® products with knowledge of HSR's trademark rights.

24. Whether HSR has developed valuable goodwill and common law rights in the HSR Marks in Florida and throughout the United States, or some more limited territory within the United States.

25. Whether Australian Gold's ROYAL FLUSH® and PURPLE REIGN® products are confusingly similar to HSR's ROYAL FLUSH and PURPLE RAIN LOTIONS.

26. Whether Australian Gold's use of the ROYAL FLUSH® and PURPLE REIGN® marks are likely to cause confusion, mistake, and/or deceive current and potential customers of the respective parties as to some presumed, but nonexistent, association, affiliation, connection, or sponsorship of Australian Gold with HSR.

27. Whether Australian Gold's use of the ROYAL FLUSH® and PURPLE RAIN® marks indicate to the purchasing public that Australian Gold and its services originate with HSR, or are affiliated, connected or associated with HSR, or are sponsored, endorsed, or approved by HSR.

28. Whether Australian Gold's use of the ROYAL FLUSH® and PURPLE RAIN® marks falsely designate the origin of Australian Gold's products and services, and falsely and misleadingly describes and represents with respect to Australian God and its products and services.

29. Whether Australian Gold's use of the ROYAL FLUSH® and PURPLE RAIN® marks enables Australian Gold to call attention to its company and products, to gain acceptance of its products, and to trade on and receive the benefit of the goodwill built up by HSR over many years.

30. Whether Australian Gold's use of the ROYAL FLUSH® and PURPLE RAIN® marks places HSR's valuable reputation and goodwill in the hands of Australian Gold.

31. Whether Australian Gold used the ROYAL FLUSH ® and PURPLE REIGN ® marks in bad faith and with willful and deliberate intent to trade on HSR's goodwill.

32. Whether HSR "abandoned" its rights in the ROYAL FLUSH mark.

33. Whether HSR completely ceased use of the ROYAL FLUSH mark.

34. Whether HSR engaged in or ceased bona fide use of the ROYAL FLUSH mark.

35. To the extent it is determined HSR ceased use of the ROYAL FLUSH mark, whether HSR did so with no intent to resume use.

36. Whether HSR "abandoned" its rights in the PURPLE RAIN mark.

37. Whether HSR completely ceased use of the PURPLE RAIN mark.

38. Whether HSR engaged in or ceased bona fide use of the PURPLE RAIN mark.

39. To the extent it is determined HSR ceased use of the PURPLE RAIN mark, whether it did so with no intent to resume use.

40. Whether Australian Gold's putative rights as the holder of the federally registered ROYAL FLUSH® mark are subject to the rights of HSR, as the first user of the unregistered ROYAL FLUSH mark, and if so, where.

41. Whether Australian Gold's putative rights as the holder of the federally registered PURPLE REIGN® mark are subject to the rights of HSR, as the first user of the unregistered PURPLE RAIN mark, and if so, where.

42. Whether HSR's continued use of the ROYAL FLUSH mark is an infringement on Australian Gold's putative trademark rights.

43. Whether HSR's continued use of the ROYAL FLUSH mark was willfully, intentionally, and deliberately done in derogation of Australian Gold's putative trademark rights.

44. Whether HSR is knowingly asserting claims to abandoned trademark rights.

## XII. CONCISE STATEMENT OF THOSE ISSUES OF LAW WHICH REMAIN FOR DETERMINATION BY THE COURT.

1. Whether HSR's claims against Australian Gold are equitably barred by laches.

2. Whether HSR's claims against Australian Gold are barred by acquiescence.

3. Whether Australian Gold used the ROYAL FLUSH® and PURPLE REIGN® marks in bad faith and with willful and deliberate intent to trade on HSR's goodwill, making such infringement an exceptional case within the meaning of 15 U.S.C. § 1117(a).

4. Whether, assuming HSR abandoned its ROYAL FLUSH MARK, HSR's use of the ROYAL FLUSH mark after Australian Gold began use is in bad faith and with willful and deliberate intent to trade on Australian Gold's goodwill, making such infringement an exceptional case within the meaning of 15 U.S.C. § 1117(a).

5. Whether HSR is knowingly asserting claims to abandoned trademark rights, making this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

6. Whether HSR will continue to be damaged and suffer irreparable injury for which there is no adequate remedy if Australian Gold is not enjoined from using its ROYAL FLUSH ® and/or PURPLE REIGN ® marks.

7. Whether Australian Gold will be permitted to present evidence relating to overhead, G&A and other expenses it seeks to deduct from its gross sales of ROYAL FLUSH ® and/or PURPLE REIGN ® products when such deductions are presented as a percentage of sales and not directly related to the ROYAL FLUSH ® and/or PURPLE REIGN ® products themselves.

8. Whether Australian Gold may seek deduction of a proportion of "fixed" costs, such as overhead, if the sales of the infringing products constitute only a small percentage of its total sales. *Abbott Labs. v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1242 (11th Cir. 2000)

9. Whether, for HSR's claims, any calculation of (1) Australian Gold's profits, (2) any damages sustained by HSR, and (3) the costs of the action should be modified subject to principles of equity. 15 U.S.C. § 1117(a).

10. Whether, for Australian Gold's counter-claim, any calculation of (1) HSR' profits, (2) any damages sustained by Australian Gold, and (3) the costs of the action should be modified subject to principles of equity. 15 U.S.C. § 1117(a).

## XIII. CONCISE STATEMENT OF ANY DISAGREEMENT AS TO THE APPLICATION OF FEDERAL RULES OF EVIDENCE OR FEDERAL RULES OF CIVIL PROCEDURE.

Currently, there is no disagreement that the Federal Rules of Evidence and the Federal Rules of Civil Procedure will apply.

## XIV. LIST OF ALL MOTIONS OR OTHER MATTERS WHICH REQUIRE ACTION BY THE COURT.

There are no motions are pending before the Court.

## XV. VOIR DIRE QUESTIONS

The Parties have attached a joint list of proposed *voir dire* questions as an exhibit to this Pre Trial Stipulation.

## XVI. ANTICIPATED LENGTH OF TRIAL

Trial on the remaining issues is anticipated to require 5 days.

EXECUTED by Stipulation this 5th day of November, 2013.

Respectfully submitted,

/s/ Harvey S. Kauget
HARVEY S. KAUGET (#116254)
Email: kaugeth@phelps.com
ERIC R. PELLENBARG (#556610)
Email: pellenbe@phelps.com
PHELPS DUNBAR LLP
100 South Ashley Drive, Suite 1900
Tampa, FL 33602-5311
(813) 472-7886
(813) 472-7570 (FAX)
COUNSEL FOR PLAINTIFF/
COUNTER-DEFENDANT

/s/ Charles J. Meyer
Charles J. Meyer
(appearing *pro hac vice*)
WOODARD, EMHARDT, MORIARTY,
MCNETT & HENRY LLP
Chase Tower
111 Monument Circle, Suite 3700
Indianapolis, IN 46204
(317) 634-3456
Fax: (317) 637-7561
cjmeyer@uspatent.com

James J. McGuire
Florida Bar No. 0187798
James B. Lake
Florida Bar No. 0023477
THOMAS & LoCICERO PL
Post Office Box 2602
Tampa, FL 33601-2602
(813) 984-3060
Fax: (813) 984-3070
jmcguire@tlolawfirm.com
jlake@tlolawfirm.com

COUNSEL FOR DEFENDANT/
COUNTER-PLAINTIFF